385 So.2d 207 (1980)
STATE of Louisiana
v.
Charles J. EDSALL.
No. 65900.
Supreme Court of Louisiana.
May 30, 1980.
Rehearing Denied July 7, 1980.
*208 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Edwin O. Ware, Dist. Atty., Greg Fowler, Edward E. Roberts, Asst. Dist. Attys., for plaintiff-appellee.
Gravel, Roy & Burnes, Richard V. Burnes, Alexandria, for defendant-appellant.
DENNIS, Justice.[*]
Defendant, Charles J. Edsall, pleaded guilty to armed robbery, La.R.S. 14:64, following an unsuccessful motion to suppress evidence, and reserved his right to appeal. See State v. Crosby, 338 So.2d 584 (La. 1976). He was sentenced to serve twenty-five years imprisonment at hard labor. He appealed and assigns as errors the trial court's rulings on the merits and procedural aspects of his motion to suppress.
At the conclusion of the motion to suppress hearing the trial judge dictated his reasons for judgment. His findings of fact, for which there is warrant in the record, are as follows:
"The pertinent and salient facts to this motion show that between 8:30 and 8:40 P.M. on Tuesday, May 15, 1979, the victim, Mack Bloodworth, Jr., after closing his business of Mack's Exxon Service Station located in the Lee Heights Community of Rapides Parish, was inside the station at his counter, counting his day's receipts and had his .357 Magnum revolver on the counter. He noticed a large 18-wheeler truck stop in front of his station and he saw this defendant come to his door and request admittance to obtain some ice. The victim allowed Charles J. Edsall to enter and went to the back of the station to fulfill this request. Upon returning with the ice, he was met by Edsall, whom he identified in court, holding his, Bloodworth's .357 Magnum. Edsall shot him in the left side and stomach area, tied him up and left him in the bathroom, taking the cash, daily receipts, and Bloodworth's pistol. Bloodworth worked himself free and at 8:53 P.M. called Michael D. Williams, the radio dispatcher of the Pineville Police Department who relayed the call to the Rapides Parish Sheriff's Department base station in Alexandria and its Tioga Branch.
"Deputy Sheriff Herbert Mount, Shift Commander on duty at this time, immediately assigned Detective Deputy William Earl Hilton who proceeded to the scene and arrived at approximately 9:00 P.M. Other officers had preceded Hilton to the scene and had put out radio transmissions of a very general description of the suspect and of the vehicle which had been seen in front of the station. Hilton, in talking to the victim and two witnesses who had observed the truck in front of the station just prior to and during the incident in question, radioed a description of the truck and the suspect to Shift Commander, Herbert Mount, who transmitted same to the surrounding base stations and to patrol units telling them of the robbery and to be on the lookout for a `White' (and that's brand name) freight liner, dark brown or purple with gold trim pulling a silver van-type trailer being driven by a white male with dark hair, five feet six inches in height, fairly young and heavy-set wearing blue jeans and some type of T-shirt and armed with a .357 Magnum.
"Among the officers hearing the call were the Chief of Police of Ball, Louisiana and his deputy, Officer Mark Musser. These two officers had proceeded southerly on U.S. 165 pursuant to the earlier description given and upon receiving this transmission from Deputy Mount, recalled *209 seeing a vehicle of that description traveling northerly on U.S. 165 a few minutes before. They turned around, gave pursuit, and overtook the vehicle just after it passed over an overpass entering Pollock, Louisiana, in the neighboring parish of Grant. At this time Deputy Sheriff W. A. Paul of the Grant Parish Sheriff's Department who was on patrol in and around the town of Pollock had also received radio communications about the suspect vehicle and the description of the subject. He saw a brand type `White Freight Liner' matching the description placed in the communication in Pollock and fell behind said truck determining to stop said vehicle outside the corporate limits of Pollock. Paul had no difficulty in identifying the type truck or the coloring by reason of the fact that this intersection in Pollock where he saw the truck is a well-lighted intersection and the truck equally passed in front of his headlights which were on.
"The Ball police unit occupied by Chief Moore and his deputy at this point were following the Grant Parish unit which turned on its flashing lights and pulled over the suspect truck. As the radio communication had warned that the subject was probably armed, they used loud-speakers and stayed in protective positions and ordered the driver from the truck. The defendant exited the driver's side of the vehicle with his hands cupped, with what later turned out to be a wallet. The officers ordered him to raise his hands and come to the rear of the trailer where he was spread-eagled against the truck and frisked and his mobility and freedom of movement were restrained. According to Chief Moore, it was clear that the driver of the truck matched the description of the robber given over the radio transmission. After this occurred, Officer Musser went to the cab of the stopped truck to determine if there was another robber and looked in with his flashlight and saw on the passenger's seat a .357 Magnum. It was similar to a Magnum that he used in his police work. The gun was removed by Musser and a Louisiana State Police officer arrived on the scene and transmitted the description of the gun through the Rapides base station to Detective Hilton at the scene of the crime. The gun was described on return communication which matched the gun found in Edsall's truck. He was then formally arrested and placed in Deputy Paul's vehicle. The officers then returned to the cab of the truck, entered same, and noted a Rapides Bank moneybag on top of the sleeper behind the seats and U.S. currency sticking out from under the mattress of the sleeper. Upon raising the sleeper, they found an additional zipper moneybag, additional currency, and credit card receipts to Mack's Exxon as well as personal checks payable to the establishment and other paperwork taken by the robber."
1. The Search and Seizure Were Lawful
When we apply the pertinent rules of law to these facts we conclude that (a) the officers lawfully detained the defendant for questioning because they had reasonable cause to suspect that he had committed the robbery; (b) the officer observed the .357 magnum in "plain view" because he was entitled as a safety precaution to a general visual survey of the vehicle from his position outside to determine if there was an accomplice in the truck; (c) the officers' search of the truck came within the ambit of the "automobile exception" to the constitutional requirement of a warrant because they had probable cause to believe the vehicle contained contraband or evidence of a crime and there were exigent circumstances requiring an immediate warrantless search.
A law enforcement officer may stop a person in a public place for questioning whom he reasonably suspects is committing, has committed or is about to commit an offense. La.C.Cr.P. art. 215.1. Reasonable cause for an investigatory stop or detention is something less than probable cause. Nevertheless, it requires the detaining officer to have articulable knowledge of particular facts sufficient reasonably to suspect the detained person of criminal activity. *210 Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Wilson, 366 So.2d 1328 (La.1978).
In the present case the detaining officer did have articulable knowledge of particular facts sufficiently reasonable to suspect the defendant of having committed an armed robbery at Mack's Exxon Service Station in Alexandria. The officer knew that the robbery had been committed approximately thirty to seventy minutes earlier that evening by a person driving an 18-wheel "White freight liner." The defendant's vehicle fitted in detail one of the police radio descriptions of the robber's truck. When the defendant dismounted, the detaining officer could see that he matched one description of the armed robber which had been broadcast over police radio.
In order for the "plain-view" doctrine to be applicable there must have been a prior justification for an intrusion into a protected area, in the course of which evidence was discovered inadvertently, or an officer must have inadvertently observed evidence of a crime from a vantage point without intrusion upon a protected area, and it must have been immediately apparent without close inspection that the items were evidence or contraband. When an officer observes evidence of a crime before entering a protected area, he may not seize the evidence without first obtaining a warrant, absent exigent circumstances or another exception to the warrant requirement. State v. Brown, 370 So.2d 525 (La. 1979); State v. Parker, 355 So.2d 900 (La. 1978).
Here, the officer observed the .357 magnum on the seat of the truck without entering a protected area. As we observed in State v. Brown, supra, 370 So.2d at 527, which presented similar circumstances, the officer "was entitled as a precaution for his own safety to a general visual survey of the vehicle from his position outside to determine if there was anyone in the car." Our conclusion is not altered by the fact that in the present case the officer had to step up on the side of the truck to shine his flashlight into its cab. Under the circumstances of this case, in which policemen were searching for an armed robber who had seriously wounded his victim, and in which the possibility of an accomplice had not yet been ruled out, a general survey of the vehicle for the protection of the officers reasonably called for the officer's actions. Likewise, as in State v. Brown, supra, the .357 magnum was immediately recognizable as the same kind of weapon that had been used in the armed robbery.
Consequently, the officers, who knew that the descriptions of the defendant, his 18-wheeler, and his weapon all matched those reported by witnesses, had probable cause to believe that the defendant was the armed robber and that the truck contained contraband or evidence of the crime. Thus, it only remains to be shown that the officers' entrance into the truck and seizure of the evidence therein was permissible under the "automobile exception" to the constitutional requirement of a warrant.
This Court has explained its view of the "automobile exception" in several recent cases. For example, in State v. Lewis, 378 So.2d 396 (La.1979), we said:
"In a line of decisions, beginning with Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Supreme Court has recognized a so-called `automobile exception' to the constitutional requirement of a warrant. Under the exception, a search warrant is unnecessary where the police have probable cause to search an automobile stopped on the highway and the circumstances require immediate action; the underlying reasons for the exception are that `the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained.' Chambers v. Maroney, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970).
"Because of the preference for a magistrate's judgment, it could be argued that, even though the police have probable cause to search and there is danger the *211 vehicle and its contents will disappear, only the immobilization of the car should be permitted until a search warrant is obtained. This argument was recognized and rejected, however, by the Supreme Court, which stated in Chambers v. Maroney:
`[A]rguably, only the "lesser" intrusion is permissible until the magistrate authorizes the "greater." But which is the "greater" and which is the "lesser" intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.' 399 U.S. at 51-52, 90 S.Ct. at 1981.
"This Court has also applied the Carroll doctrine and has not required a search warrant in cases falling under the `automobile exception.' State v. Wilbourn, 364 So.2d 995 (La.1978); State v. Guzman, 362 So.2d 744 (La.1978); State v. Lain, 347 So.2d 167 (La.1977); State v. Williams, 347 So.2d 231 (La.1977); State v. Tant, 287 So.2d 458 (La.1973).
"Neither Carroll nor any other case in the Supreme Court requires or suggests, however, that in `every conceivable circumstance the search of an auto even with probable cause may be made without the extra protection for privacy that a warrant affords.' Chambers v. Maroney, supra, 399 U.S. at 50, 90 S.Ct. at 1981. See also State v. Colvin, 358 So.2d 1250 (La.1978); State v. Parker, 355 So.2d 900 (La.1978). Furthermore, a clear rule for determining when the police may invoke the automobile exception has yet to be fashioned by a majority of the high court. A plurality in Coolidge, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 stated that the lack of a warrant invalidated a search of a car after it was seized from the defendant's driveway under circumstances in which there was no possibility that the car would be moved or any evidence destroyed. Therefore, `no possible stretch of the legal imagination [could make the case into one] where "it [was] not practicable to secure a warrant."' Coolidge, supra, 403 U.S. at 462, 91 S.Ct. at 2036. A different plurality in Cardwell v. Lewis, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), however, approved a warrantless seizure of an automobile for the purpose of inspecting its exterior and tires, and obtaining paint scrapings, emphasizing that the auto, unlike the Coolidge car, `was seized from a public place where access was not meaningfully restricted.' 417 U.S. at 593, 94 S.Ct. at 2470." 378 So.2d at 398.
Although the high court has not established a clear definition of the automobile exception, we think the facts of the present case bring the search here within its ambit. Probable cause to search the truck existed, as we have seen, because it was linked to the robbery by its own description and that of the defendant and the robbery weapon. Furthermore, under the facts of this case, the officers were faced with exigent circumstances requiring that they either seize and hold the vehicle before presenting the probable cause issue to a magistrate or carry out an immediate search without a warrant. The truck was stopped in a public place, on the side of U.S. Highway 165 near the small town of Pollock, Louisiana. It was therefore accessible to anyone who might have a reason to move it or remove evidence from it. Under all of the circumstances, the election of the officers to conduct an immediate search was a reasonable course and does not require that we invalidate their action.
2. The Alleged Violation of Sequestration Does Not Require Reversal.
The defendant contends that the trial court erred in failing to preclude the testimony of witness Leslie Graham because of a violation of a rule of sequestration. The hearing on defendant's motion to suppress spanned two days: Friday, September 21, *212 1979 and Tuesday, September 25, 1979. Several witnesses, including Officer William Hilton, were placed under a rule of sequestration, with the judge explaining to the witnesses that they were not to discuss the case with anyone until the matter was concluded. On Monday, September 24, 1979, the district attorney held a meeting in his office which included four officers, who were not under the rule of sequestration, and Officer Hilton. At the meeting Hilton took part in a discussion about Leslie Graham, an individual Hilton remembered talking to on the night of the robbery. One officer present at the meeting, Officer Woodson, remembering that Graham had given a good description of the truck used in the robbery, discussed this description with the district attorney. Officer Hilton also picked up Leslie Graham at an airport in Alabama and brought him back to testify.
The defendant contends, based upon these violations of the rule of sequestration, that the testimony of Graham should be excluded. While an order of sequestration is intended to assure that a witness will testify as to his own knowledge of a case, not every violation of a sequestration order must result in exclusion of the witness' testimony. State v. Lewis, 367 So.2d 1155 (La.1979). In the present case the trial judge ruled that Graham's testimony should not be precluded. We affirm his ruling because there is no evidence that either Graham's or Hilton's testimony was tainted by the violation. Although Hilton testified after his violation, his initial testimony, which occurred prior to the violation, completed the most significant part of his testimony, namely, his testimony as to the description of the truck used in the robbery. Although Officer Hilton picked up Graham at the airport when he was brought back to testify, Hilton denied talking to Graham about the robbery and the defense failed to introduce any evidence which would indicate the contrary.
For the reasons assigned, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[*] The Honorable Edward A. de la Houssaye, III participated in this decision as an Associate Justice pro tempore.